**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| BERNARD WILLIAMS, | ) | |
| | ) | No. 21 C 819 |
| *Plaintiff,* | ) | |
| | ) | Hon. Charles P. Kocoras, |
| *v.* | ) | District Judge |
| | ) | |
| KRISTON KATO, SAMUEL CIRONE, | ) | |
| PATRICIA SAWCZENKO, JOHN | ) | |
| FARRELL, SERGEANT CHASEN, M. | ) | |
| CRONIN (Star No. 15490), J. RAWSKI | ) | |
| (Star No. 3556), SERGEANT J. RISLEY | ) | |
| (Star No. 975), UNKNOWN | ) | |
| EMPLOYEES of the CITY OF | ) | |
| CHICAGO, and the CITY OF | ) | |
| CHICAGO, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| *Defendants.* | ) | |

<u>**FIRST AMENDED COMPLAINT**</u>

NOW COMES Plaintiff, BERNARD WILLIAMS, by his attorneys LOEVY & LOEVY,

and complaining of Defendants KRISTON KATO, SAMUEL CIRONE, PATRICIA

SAWCZENKO, JOHN FARRELL, SGT. CHASEN, M. CRONIN, J. RAWSKI, SGT. J.

RISLEY, UNKNOWN EMPLOYEES of the CITY OF CHICAGO, and the CITY OF

CHICAGO, states as follows:

### INTRODUCTION

1.      Plaintiff Bernard Williams was just 17 years old when he was wrongly convicted

of the 1996 shooting murder of Gary Thomas. Williams spent more than 23 years in prison for a

crime he did not commit.

2.      Williams' wrongful conviction was caused by the egregious misconduct of the Defendant Chicago Police Officers, who fabricated evidence and suppressed evidence to secure Williams' arrest, prosecution, and conviction.

3.      For example, Defendants fabricated an entirely fictitious report, which stated that Williams confessed to the crime. This was untrue. Williams has steadfastly maintained his innocence.

4.      Defendants also used illegal and abusive police interrogation tactics to coerce Williams' co-defendant DeAngelo Johnson into falsely confessing to the crime, in which he also falsely implicated Williams. Defendants knew at all times that the statements they coerced from Johnson were not true.

5.      And Defendants manipulated witnesses into providing false identifications of Williams and statements to implicate him in the crime.

6.      Defendants never recovered a murder weapon, and no physical evidence has ever tied Williams to the shooting. Williams' conviction was based solely on Defendants' misconduct.

7.      Williams' wrongful conviction was one of many examples of a custom by Defendant Kato and his colleagues at Detective Area Four of the Chicago Police Department of fabricating evidence, extracting false confessions and statements, and suppressing evidence to convict innocent people of crimes. Indeed, Defendant Kato throughout his tenure beat a number of suspects into providing false confessions and coerced and used force against witnesses during investigations to secure false statements from them, implicating innocent individuals in crimes they had not committed.

8.     Despite numerous complaints and allegations against Defendant Kato, the City of Chicago took no action to correct his pattern of misconduct and never disciplined him.

9.     In February 2019, Williams' conviction was vacated by the Illinois Appellate Court.

10.     In August 2023, he was acquitted of all charges against him.

11.     Williams seeks justice for the harm that Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of Defendants' misconduct.

## JURISDICTION AND VENUE

12.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

13.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

15.     Plaintiff Bernard Williams spent more than 23 years wrongfully incarcerated for a murder that he did not commit. Williams is a 40-year-old resident of Chicago, Illinois. He is currently spending as much time as possible with his family.

16.     At all times relevant to the events described in this Complaint, Defendants Kriston Kato, Samuel Cirone, Patricia Sawczenko, John Farrell, Sgt. Chasen, M. Cronin, J. Rawski, Sgt. J. Risley, and other unknown law enforcement officers were police officers in the Chicago Police Department acting under the color of law and within the scope of their employment for the City of Chicago.

17.     At all times relevant to the events described in this Complaint, Defendants Chasen and other unknown law enforcement officers supervised the officers in the preceding paragraph, acting under color of law and within the scope of their employment for the City of Chicago, they participated in the misconduct alleged in this Complaint and/or facilitated, condoned, approved, and turned a blind eye to the constitutional violations committed by the officers in the preceding paragraph.

18.     Defendant City of Chicago is an Illinois municipal corporation and is and/or was the employer of each of the Defendants. The City of Chicago is liable for all torts committed by Defendants pursuant to the doctrine of *respondeat superior*. The City of Chicago is additionally responsible for the policies and practices of the Chicago Police Department that caused Williams' wrongful conviction.

## FACTS

### The Shooting of Gary Thomas

19.     On August 23, 1996, Gary Thomas was shot and killed as he stood on the sidewalk in front of Wash's Lounge, a tavern in the West Garfield Park neighborhood of Chicago.

20.     Thomas was standing outside with Eric Smith, Martinoe Powell, and Powell's young son. Smith, Powell, and his son were not injured, but three bystanders were also hit during the shooting.

21.     Police officers arrived at the scene and spoke with one of the victims who identified the shooters as two Black males, approximately 18-19 years old, average height.

22.     At the hospital, Defendant Sawczenko and two other detectives spoke to Martinoe Powell. Powell stated that he did not recognize the shooters. He indicated that Eric Smith might be able to identify them.

23.     On the day of the shooting, none of the victims or witnesses ever identified Williams as the perpetrator.

24.     The reason why no one identified Williams as the perpetrator is because Williams had nothing to do with the shooting.

**Defendants Frame Williams**

25.     Defendants Kato, Cirone, and Farrell picked up the investigation with Defendant Sawczenko.

26.     Unable to identify a suspect, Defendants framed Williams for the crime.

27.     After interviewing Eric Smith, who stated that he recognized the two shooters but could not provide any names, Defendants fabricated a report stating that Smith had identified one of the shooters as Williams. Smith had done no such thing, and Defendants knew he had not.

28.     Defendants then manipulated, coerced, and induced Powell into identifying Williams as one of the shooters in a photo array.

29.     For example, at the time of the investigation, Defendants knew that Powell, who was abusing drugs, was vulnerable to coercive tactics. Defendants fed Powell information on the case, identified Williams' photo in the photo array, and manipulated Powell into identifying Williams as one of the shooters.

30.     Based on this fabricated information and without probable cause or a warrant, Defendants located Williams, who was in a car with DeAngelo Johnson and Shawn Harris, arrested them, and brought all three of them to Chicago Police Detective Area Four, where they were questioned.

**Defendants Obtain Fabricated Statements from Johnson**

31.     At Area 4, Defendants Kato and Cirone interrogated Johnson several times about the shooting.

32.     During the interrogations, Kato and Cirone physically and psychologically abused Johnson and forced him to confess to the Thomas shooting.

33.     The false confession fabricated by Kato and Cirone and attributed to Johnson falsely implicated Williams in the shooting.

34.     At the time, Johnson was just 16 years old and had a low IQ. Johnson was also detained for over 24 hours and deprived of food and sleep.

35.     Johnson was never a suspect in the shooting. The only reason Johnson was detained and interrogated was because he was in the car with Williams.

36.     Defendants knew that Johnson's youth rendered him particularly vulnerable to coercive interrogation tactics. Yet they abused their police power and used illegal tactics to secure a confession knowing that it was false.

37.     In addition, Defendants interrogated Williams and accused him of lying when he professed his innocence.

38.     When Williams asked for an attorney and said he did not want to talk with Defendants, they ignored his requests and continued their interrogation.

39.     Forced to talk, Williams truthfully told Defendants he knew nothing about the shooting.

40.     Defendants later interrogated Williams again. During this interrogation, Defendants lied to him about evidence they uncovered from other witnesses in an attempt to secure false and involuntary statements they could use to incriminate Williams.

41.     Defendants believed they needed to coerce and fabricate statements from Williams because they knew they lacked any evidence to link Williams to the Thomas murder.

42.     Williams was detained and interrogated in this coercive manner for over 24 hours, sleep deprived and without access to his attorney or his mother despite his repeated requests for them.

43.     After the interrogation, Defendants fabricated a police report which stated that Williams confessed to participating in the shooting. Defendants had no video recording or handwritten notes memorializing this interrogation where Williams allegedly confessed, nor could they because it never happened.

44.     Williams has consistently asserted his innocence.

45.     The same day, Defendants located Powell and brought him to Area 4, forcing him once again into falsely identifying Williams as one of the shooters during an in-person lineup.

46.     In committing the misconduct described above, Defendants made an agreement with one another, and with others currently unknown to Plaintiff, to individually and jointly secure a false and involuntary confession from Johnson, to manipulate and coerce witnesses into implicating Williams in the shooting, to fabricate evidence, and to use that false evidence to initiate and perpetuate false criminal charges against Williams.

**The City of Chicago's Policy and Practice of Prosecuting Innocent Persons in Violation of Due Process and Fabricating Confessions, Witness Statements, and Witness Identifications**

47.     The Chicago Police Department is responsible by virtue of its official policies for scores of miscarriages of justice like that inflicted upon Plaintiff.

48.     Since 1986, no fewer than 70 cases have come to light in which Chicago police officers have fabricated false evidence or have suppressed exculpatory evidence to cause the convictions of innocent persons for serious crimes they did not commit.

49.     These cases include many in which Chicago police officers used similar tactics that Defendants employed against Plaintiff in this case, including: (1) using physically and psychologically coercive tactics to obtain involuntary and false confessions; (2) fabricating witness statements; (3) concealing exculpatory evidence; (4) manipulating witnesses in order to influence their testimony; and (5) using other tactics to secure the arrest, prosecution and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

50.     At all times relevant hereto, members of the Chicago Police Department, including Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent persons, knowing full well that those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including Defendants in this action, contrived false narratives that were fed to vulnerable suspects and witnesses, who then adopted those false witness narratives as their own for the purpose of wrongly convicting an innocent person. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

51.     The municipal policy and practice described in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, *inter alia*, that Chicago police detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse false narratives so that there were no inconsistencies in the witnesses' stories.

52.     At all times relevant hereto, members of the Chicago Police Department, including Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine

files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation, rather than being maintained as part of the official file.

53.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

54.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, inter alia, *Fields v. City of Chicago*, 10 C 1168 (N.D. Ill.) and *Jones v. City of Chicago*, 87 C 2536 (N.D. Ill.).

55.     The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Thomas murder and investigation at issue here.

56.     In addition, a set of clandestine street files related to Area Five homicide was found in the case of *Rivera v. City of Chicago*, 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

57.     Put simply, the policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at the time of the investigation into the Thomas murder, including in the Area Four Detective Division.

58.     The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of the misconduct in any of those cases.

59.     Prior to and during the period in which Plaintiff was falsely charged and convicted with the Thomas murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

60.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

61.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department, officers (including Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department

act with impunity when they violate the constitutional and civil rights of citizens.

62.     This includes Defendants in this case. By way of example, Defendant Kato has a long history of engaging in the kind of investigative misconduct that occurred in this case, including coercing confessions, manipulating witnesses, fabricating evidence, and concealing evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which Defendant Kato has engaged in serious investigative misconduct, including many cases in which Defendant Kato manipulated and coerced suspects and witnesses and fabricated and concealed evidence, as Kato and his co-defendants did in this case. Defendant Kato engaged in such misconduct because he had no reason to fear that the City of Chicago and its Police Department would ever discipline him for doing so.

63.     The City of Chicago and its Police Department also failed in the years prior to Williams' wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in the following areas, among others:

a.      The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses, and young or otherwise vulnerable persons in particular.

b.      The need to accurately report, record, maintain, and review evidence to ensure that false or inaccurate information was not provided to state prosecutors.

c.      The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified to ensure that the evidence is made part of the criminal proceeding.

d.      The risks of engaging in tunnel vision during investigation.

e.   The need for full disclosure, candor, and openness on the part of all officers who

participate in the police disciplinary process, both as witnesses and as accused

officers, and the need to report misconduct committed by fellow officers.

64.   The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

65.   The City's failure to train, supervise, and discipline its officers, including Defendants, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

66.   The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

67.   The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendant Kato's History of Using Force and Other Coercive Tactics During Interrogations**

68.     As a result of the policies and practices of the Chicago Police Department, described above, Defendant Kato has framed dozens of other innocent men over the span of two decades. Like Plaintiff, these men have all lodged independent accusations of similar misconduct against him.

69.     Defendant Kato has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including abusive tactics, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Kato has engaged in serious investigative misconduct.

70.     Given this extensive history of misconduct and the City of Chicago's failure to meaningfully discipline Defendant Kato and others, it is apparent that Defendant Kato engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his conduct.

71.     Examples of Defendant Kato's misconduct include:

a.      In 1988, Detective Kato slapped and kicked Frederick Seaton, and held him for more than 30 hours until he gave a statement. Though Kato's treatment of Seaton was later declared unlawful, the City of Chicago did nothing in response.

b.      In 1988, Detective Kato beat Gregory Shelton, by slapping and kicking him; holding him overnight and for more than 24 hours; denying him access to food and an attorney; and by telling him that the abuse would only stop if he confessed.

14

c.   In 1988, Kevin Murry was interrogated for over 24 hours before he confessed. During that period of time, he was struck by Defendant Kato and denied access to food, bathroom, and an attorney.

d.   Also in 1988, Detective Kato beat Tony Bey (aka tony Steward), including by putting a gun in Bey's mouth, all to get him to falsely confess to a murder, of which he was later acquitted at trial.

e.   In 1988, Detective Kato beat Jerry Butler after illegally arresting him without a warrant and kicked and punched him in the chest, all in an unsuccessful attempt to get him to falsely confess.

f.   In the course of a robbery interrogation, Defendant Kato punched suspect Auby Christian in the chest in 1988.

g.   Keith Washington was physically abused by Detective Kato in 1989, when he was interrogated overnight and for more than 24 hours. Detective Kato punched him in the chest, choked him, and denied him access to the bathroom and food. As a result, Washington gave a confession.

h.   During a 1989 interrogation, Detective Kato punched and kicked Shawn Hardy in an attempt to get him to confess.

i.   In 1989, Detective Kato, and others, held Miller Holston overnight during the course of an interrogation lasting more than 20 hours where they struck and kicked him during the interrogation. The charges against Holston were later dismissed.

j.   Harold Lucas was only 15 when, in 1989, Defendant Kato accused him of murder, interrogated him, punched and slapped him, and even wounded his genitals all in an effort to secure a confession.

k.   In 1990, Detective Kato beat Randall and Christopher Haywood by kicking and punching them, all in an attempt to get them to provide confessions and other inculpatory statements.

l.   Also in 1990, Detective Kato attempted to obtain a false confession from Daniel Gasca, despite the fact that Gasca was in custody at the time of the crime. To do so, Detective Kato struck him 12-15 times in the head, throat, and chest, and held him for more than 15 hours.

m.   In the same investigation, Detective Kato beat Michael Waslewski by kicking and punching him, until Waslewski made a false confession, including having committed the crime with Gasca even though that was physically impossible.

n.   Willie Smith, who suffered from diabetes, was interrogated for a murder in 1992, during which Detective Kato withheld insulin from Mr. Smith to force him to sign a false confession. After the confession was tossed, the charges against Smith were dropped.

o.   In 1993, Detective Kato punched Aaron Douglas in the face several times in an effort to get him to confess.

p.   Andre Wallace was just 15 when, in 1994, Detective Kato beat him by holding him overnight, squeezing his gentiles, promising him leniency, and obtained a false confession.

q.     In 1996, Esekiel McDaniel was taken to Area 4 in the middle of the night where Detective Kato slapped and threatened him during an overnight interrogation.

r.     Yet another juvenile, Xavier Johnson who was 16 at the time, was interrogated by Detective Kato in 1997, during which Kato kicked and kneed Johnson, and fabricated a confession.

s.     Keith Mitchell was interrogated more than the course of three days in 1997 and physically abused by Detective Kato with elbows, knees, and other threats, all in an effort to have him provide a false witness statement to a murder that Mitchell did not actually witness.

t.     James Guyton was arrested and interrogated more than the course of 24 hours, during which he was slapped by Detective Kato, among other things.

u.     In 2002, Detective Kato beat a severely mentally ill man, Carl Chatman, into providing a false confession. Kato beat him and then tried to hide his name on official documents.

v.     In 2003, Deunsha Woods was held and interrogated over the course of three days, during which Detective Kato repeatedly punched, threatened, and even choked Mr. Woods.

72.     The City of Chicago is well aware of the pattern with respect to Detective Kato. Indeed, the City has received formal complaints to Kato's abuse of Tony Bey (Tony Steward), Jerry Butler, Auby Christian, Keith Washington, Shawn Hardy, Miller Holston, Harold Lucas, Randall Haywood, Christopher Haywood, Willie Smith, Aaron Douglas, Andre Wallace, Xavier Johnson, Keith Mitchell, James Guyton, Carl Chatman, Deunsha Woods, and others. Courts have also concluded that Detective Kato's conduct was unconstitutional. In addition, the Illinois Torture Inquiry Commission found that Kevin Murray had stated a credible claim of torture against Kato. Nonetheless, exhibiting its deliberate indifference, the City of Chicago has never done nothing in response to this systemic misconduct.

73.     As the examples above demonstrate, the City of Chicago failed to meaningfully discipline Defendant Kato or other officers engaged in similar misconduct. Defendants engaged in the misconduct set forth in this Complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

## Williams's Wrongful Conviction

74.     As a result of Defendant's misconduct, Williams was charged and prosecuted for the murder of Thomas. He was convicted at a bench trial in 1998. The judge sentenced him to 80 years in prison.

75.     Only Defendants' fabricated evidence was used against Williams at trial.

76.     There was no physical evidence tying Williams to the crime. No fingerprints, DNA, or any other forensic evidence ever linked Williams to the shooting.

77.     In fact, there was never any probable cause to believe that Williams was involved in the murder either before or after any of the Defendants' misconduct.

78.     Without Defendants' misconduct described above, Williams would not have been prosecuted or convicted.

79.     Williams was 17 years old when he was arrested. He spent more than 23 years of his life incarcerated for a crime that he did not commit.

80.     Williams' whole life was turned upside down without any warning. His young adulthood was consumed by the horror of his wrongful imprisonment.

81.     Because of Defendants' misconduct, Williams was taken away from, and missed out on, the lives of his family and friends. He missed out on the ability to share holidays, births, and other life events with loved ones.

82.     Significantly, Williams missed out on raising his son, who was only 9 months old when Williams was wrongfully incarcerated. He also missed out on spending time with loved ones who passed away, including his grandmother and other close uncles, and not being able to attend their funerals.

83.     Plaintiff was robbed of his opportunity to gain an education, to start a family, to engage in meaningful labor, to develop a career, and to pursue his interests and passions.

84.     During his roughly quarter-century long wrongful imprisonment, Williams was detained in harsh and dangerous conditions in maximum-security prisons.

85.     In February 2019, Williams' conviction was vacated by the Illinois Appellate Court.

86.     In August 2023, he was acquitted of all charges against him.

87.     Williams must now attempt to make a life for himself outside of prison without the benefit of the foundational life experiences which people normally develop throughout their formative teenage and young-adult years.

19

88.     In addition to the trauma of wrongful imprisonment and Williams' loss of liberty, Defendants' misconduct continues to cause him extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects. Plaintiff has been branded a murderer. He has suffered profound reputational harm as a result.

## COUNT I – 42 U.S.C. § 1983
### Due Process (Fourteenth Amendment)

89.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here. In the manner described more fully above, Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

90.     In the manner described more fully above, Defendants deliberately withheld exculpatory and impeachment evidence from Plaintiff and from prosecutors, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution.

91.     Defendants also fabricated and manufactured evidence and solicited false evidence, fabricated police reports falsely implicating Plaintiff in the crime and stating falsely that Plaintiff confessed to the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

92.     Defendants also used illegal interrogation tactics in an attempt to extract involuntary statements from Plaintiff, which Defendants attempted to use to incriminate Plaintiff during his criminal proceedings and to secure his conviction.

93.     In addition, Defendants suppressed evidence that would have demonstrated Plaintiff's innocence.

94.     In addition, based upon information and belief, Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

95.     Defendants' misconduct described in this count resulted in Plaintiff's unjust and wrongful criminal prosecution and conviction, deprived him of his liberty, caused statements extracted from him involuntarily to be used to incriminate him, and denied him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment.

96.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

97.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

98.     The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count V.

**COUNT II – 42 U.S.C. § 1983**
**Illegal Detention**
**(Fourth and Fourteenth Amendments)**

99.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

100.     In the manner described more fully above, Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured in order to accuse Plaintiff of criminal activity and to cause the institution and continuation of criminal proceedings against Plaintiff, without probable cause.

101.     In so doing, Defendants caused Plaintiff to be detained without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

102.     These Defendants initiated and continued judicial proceedings against Plaintiff maliciously, resulting in injury.

103.     After 23 years, an Illinois Appellate Court vacated Plaintiff's conviction. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

104.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

105.     The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count V.

### COUNT III – 42 U.S.C. § 1983
### Failure to Intervene

106.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

107.     In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

108.     As result of Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty and physical and emotional distress. Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

109.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

110.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

111.    The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT IV – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

112.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

113.    Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, as described in the various paragraphs of this Complaint.

114.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

115.    In furtherance of this conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

116.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

23

117.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

118.     The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count V.

### COUNT V – 42 U.S.C. § 1983
### Policy and Practice Claim Against the City of Chicago

119.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

120.     As described more fully herein, the City of Chicago is liable for the violation of Plaintiff's constitutional rights by virtue of its official policies.

121.     Plaintiff's injuries were caused by the express policies, absence of needed express policies, and widespread practices and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

122.     At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: the conduct of interrogations and questioning of criminal suspects by officers and agents of the Chicago Police Department and the City of Chicago; the collection, documentation, preservation, testing, and disclosure of evidence; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to the

conduct of interrogations and the techniques to be used when questioning criminal suspects, including juvenile suspects and witnesses.

123.     These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including Defendants.

124.     In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely implicated in a crime through involuntary and coerced statements. It was common that suspects interrogated in connection with investigations within the jurisdiction of the Chicago Police Department and the City of Chicago, such as Plaintiff's co-defendant, falsely confessed under extreme duress and after suffering abuse, to committing crimes to which they had no connection and implicated other innocent persons in the process.

125.     Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects and witnesses were coerced to involuntarily implicate themselves and others and to provide plainly false statements by various means, including but not limited to: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers

and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

126.     In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated police reports and other false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; and/or (5) officers pursued wrongful convictions through profoundly flawed investigations.

127.     These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation and investigation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

128.     The above widespread practices and customs, so well settled as to constitute *de facto* policies of the City of Chicago, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

129.     As a result of the policies and practices of the City of Chicago and the Chicago Police Department, numerous individuals have been wrongly convicted of crimes that they did not commit.

130.     In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

131.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

**COUNT VI – State Law Claim Malicious Prosecution**

132.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

133.     In the manner described above, Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

134.    In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

135.    An Illinois Appellate Court vacated Plaintiff's conviction.

136.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's innocence.

137.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT VII – State Law Claim Intentional Infliction of Emotional Distress**

138.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

139.    The actions, omissions, and conduct of Defendants, acting as investigators and as set forth above, were extreme and outrageous.

140.    These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

141.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages set forth above.

## COUNT VIII – State Law Claim Civil Conspiracy

142.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

143.    As described more fully in the preceding paragraphs, the Defendants, acting in concert with other known and unknown co-conspirators, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

144.    The violations of Illinois law described in this Complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

145.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's innocence.

146.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

## COUNT IX – State Law Claim

### *Respondeat Superior*

147.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

148.    In committing the acts alleged in the preceding paragraphs, Defendants were employees of the City of Chicago and the Chicago Police Department, acting at all relevant times within the scope of their employment and under color of law.

149.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

29

## COUNT X – State Law Claim Indemnification

150.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

151.     Defendants are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described above.

152.     The City is liable to indemnify any compensatory judgment awarded against Defendants.

WHEREFORE, Plaintiff, BERNARD WILLIAMS, respectfully requests that this Court enter judgment in his favor and against Defendants KRISTON KATO, SAMUEL CIRONE, PATRICIA SAWCZENKO, JOHN FARRELL, SGT. CHASEN, M. CRONIN, J. RAWSKI, SGT. J. RISLEY, UNKNOWN EMPLOYEES of the CITY OF CHICAGO, and the CITY OF CHICAGO, Illinois, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the individual Defendants, as well as any other relief this Court deems appropriate. Plaintiff also asks that, upon a finding of liability against the City of Chicago, he be allowed to seek equitable relief to provide a further remedy to the systemic constitutional violations within the City of Chicago.

## JURY DEMAND

Plaintiff, BERNARD WILLIAMS, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

**BERNARD WILLIAMS**

By:  /s/ Steve Art
     *One of Plaintiff's Attorneys*

     Arthur Loevy
     Jon Loevy
     Steve Art
     David B. Owens
     LOEVY + LOEVY
     311 N. Aberdeen Street, 3rd Floor Chicago,
     IL 60607
     (312) 243-5900
     steve@loevy.com

## CERTIFICATE OF SERVICE

I, Steve Art, an attorney, hereby certify that on September 20, 2023, I filed the foregoing

FIRST AMENDED COMPLAINT using the Court's CM/ECF system, which effected service on

all counsel of record.

/s/ Steve Art
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Steve Art
David B. Owens
LOEVY + LOEVY
311 N. Aberdeen Street
Chicago, IL 60607
(312) 243-5900
steve@loevy.com